# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

JOSUE JEROME WALTON,     )
                           )
          **Petitioner,**     )
                           )
       **vs.**            )     **Case No. CIV-09-281-F**
                           )
JIM KEITH, Warden,      )
                           )
          **Respondent.**     )

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner appearing pro se, brings this action pursuant to 28 U.S.C. § 2254, seeking habeas relief from his state court convictions. United States District Judge Stephen P. Friot referred this matter to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). A response to the petition has been filed, as well as a reply. Thus, the matter is at issue and ready for disposition. For the following reasons, it is recommended that the petition be denied as to Grounds One, Three, Four, Five, Six and Seven and that consideration of Ground Two be deferred pending further briefing.

By this action, Petitioner challenges his convictions following a jury trial on five counts of robbery with a firearm. Case No. CF-2004-5476, District Court of Oklahoma County; Petition, 2-3.[1] Petitioner waived his right to have a jury determine his sentences, instead electing to allow the trial judge to determine them. Response, 1. The trial court

---

[1]The page numbers used for the petition are the pre-printed numbers in the upper right hand corner of the "form" petition. Page 2 is actually the first page.

sentenced Petitioner to thirty years imprisonment on each count, with the sentences to run concurrently.  Id.  On direct appeal, the Oklahoma Court of Criminal Appeals affirmed Petitioner's convictions.  Walton v. State, No. F-2006-920 (Okla. Crim. App. Mar. 14, 2008) (attached to Response as Ex. 3); Petition, 3.  Petitioner did not seek state post-conviction relief.  Petition, 4.

Petitioner raises seven grounds for relief.  In Ground One, he alleges that the evidence was insufficient to support a conviction on any of the five counts. Petition, 6.  In Ground Two he challenges the sufficiency of the evidence specifically with regard to count two. Petition, 7. In Ground Three, Petitioner claims that the trial court used the incorrect enhancement  statute in arriving at the sentence imposed.  Petition, 9. In Ground Four, Petitioner alleges that the trial court did not consider the statutory 85% limit on parole eligibility in determining his sentence.  Petition, 11. In Ground Five, Petitioner claims that his sentence is excessive when compared to those received by others charged with the same crimes. Petition, 15.  In Ground Six, Petitioner claims prosecutorial misconduct related to comments made by the prosecutor in voir dire and in closing argument.  Petition, 17. Seventh, and finally, Petitioner claims that the cumulative effect of these errors denied him the right to a fair trial. Petition, 19.

## I.  BACKGROUND[2]

---

[2]This is intended only as general background, and is taken from the statements of facts in the briefs filed on direct appeal. Response, Ex. 1, 3-5;  Response, Ex. 2, 2-5. Specific facts will be cited from the record as they become pertinent to the undersigned's consideration of the merits.

At around 10:30 p.m. on September 25, 2004, a number of masked gunmen entered an Applebee's restaurant in Oklahoma City and ordered employees and patrons to get on the floor. An assistant manager was forced at gunpoint to hand over money and other items that were in the office safe and the men took cash from the restaurant bar's cash drawer. At one point, the gunman who was demanding money from the assistant manager fired his gun into the ceiling above her head. The customers were also forced at gunpoint to turn over their wallets. Various witnesses at the restaurant reported that anywhere from three to six men were involved.

After one of the gunmen who had remained at the front during the robbery yelled "time, time, we gotta go," the robbers left the restaurant and ran north. A witness who lived in a home near the restaurant saw three men run from the restaurant, across the parking lot and get into a white Nissan that was parked on the street adjacent to his window. Some police officers responded to the restaurant while others were looking for the white car.

A police officer in The Village, a nearby suburb through which it appeared the suspects might be heading, was monitoring scanner traffic and parked his cruiser to maintain a look out for the vehicle. Shortly thereafter, he saw a white car with a non-working tail light pass. He initiated a stop of the white car, but after he exited his cruiser the vehicle took off at a high rate of speed. The driver led several officers on a high speed chase that ended when the car lost control and crashed. The men exited the badly-damaged car and took off on foot, but three men were quickly apprehended. Petitioner was not one of the men apprehended at the scene. After the men had been captured, police officers found a shotgun laying next to

the car, and found additional weapons, clothing, money, and other items connected to the robbery inside. A total of four guns were discovered: three were either in or beside the car, and a fourth was abandoned by the suspects as they ran from the wrecked vehicle. Also found were four sets of latex gloves and four ski-type masks.

It was determined that the car belonged to Petitioner's fiancé. She testified that there had been a barbeque party at their home on the day of the robbery, and that Petitioner had fallen asleep drunk on the couch. She asked the guests to leave around 8:00 to 9:00 p.m., and woke up Petitioner to tell him to go to bed. After tidying up and relaxing, she joined Petitioner in bed around 10:00 to 10:15 p.m. When she awoke early the next day, she discovered her car missing and called in a report to police. She testified that Petitioner was there when she woke.

Petitioner later told an investigator that one of the men apprehended was a childhood friend, and that the other two were cousins. He also told the investigator that all three of the men were at his home for the barbeque on the day of the robbery. DNA consistent with Petitioner's was found on one of the ski-type masks that were discovered in the car, and he could not be excluded as the source of DNA on one of the latex gloves also found in the car. Petitioner was arrested seven months after the robbery.

## II. STANDARD GOVERNING PETITIONS FOR HABEAS CORPUS

For factual and legal issues that have been adjudicated in state court, a federal district court may only grant a writ of habeas corpus if the state court's adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). A state court's determination is contrary to clearly established federal law if it applies a rule that contradicts the law set forth in Supreme Court cases or confronts a set of facts that are materially indistinguishable from a Supreme Court decision, but arrives at a different result. <u>Williams v. Taylor</u>, 529 U.S. 362, 405-406 (2000). A state court's determination involves an unreasonable application of clearly established federal law if it identifies the correct governing legal principle from Supreme Court decisions, but unreasonably applies that principle to the facts of the petitioner's case. <u>Id.</u> at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." <u>Id.</u> at 411.

If a state court resolves issues in a summary disposition with little or no legal reasoning, a federal habeas court still owes deference to the result. <u>Paine v. Massie</u>, 339 F.3d 1194, 1198 (10th Cir. 2003). A state court's summary disposition must be upheld unless a federal habeas court is persuaded, after conducting an independent review of the record and pertinent federal law, that the state court's result "unreasonably applies clearly established federal law." <u>Id.</u> (quoting <u>Aycox v. Lytle</u>, 196 F.3d 1174, 1178 (10th Cir. 1999)).

## III. DISCUSSION

### A. GROUNDS ONE AND TWO, SUFFICIENCY OF THE EVIDENCE

Petitioner contends in Grounds One and Two that the evidence admitted at his trial was not sufficient for a jury to have found the essential elements of first degree robbery. In Ground One he claims (1) that he presented alibi evidence showing that he was at home when the robberies took place; (2) state witnesses testified that they saw only three robbers; and (3) evidence was presented explaining why his DNA was found on one of the masks discovered in the car used in the robberies. Petition, 6. In Ground Two he claims that there was no evidence connecting a wallet that was the basis of the robbery charge in count two to either Petitioner or the Applebee's robbery. Petition, 7.

In response to Ground One, Respondent contends that after considering all the evidence and being properly instructed on Petitioner's alibi defense, the jury chose not to believe Petitioner's alibi defense. Response, 7. He points out that the alibi defense was based upon the testimony of Petitioner's wife, that evidence placed Petitioner with the other three robbers on the same day as the robbery, that four masks and four sets of gloves were discovered in the getaway car – which was registered to Petitioner's then-fiancé – and that DNA evidence linked Petitioner to one of the masks found in the car. Response, 8-9. Respondent argues that Petitioner's claim that witnesses only saw three robbers selectively ignores the testimony of two witnesses who claimed to see at least four robbers, and evidence that four sets of latex gloves and four masks – one that contained DNA matching that of Petitioner – were found in the getaway car. Response, 10-11. Finally, Respondent contends

that Petitioner's claim that he used gloves and a mask at work where he was exposed to chemicals was countered by evidence that a black mask similar to that upon which Petitioner's DNA was found was used in the robbery. Response, 13.

In response to Ground Two, Respondent states that the evidence presented at trial showed that the robbers took wallets and personal items from the victims at gunpoint. Response, 17. Respondent then contends that police observed the suspects throwing items from the car during their pursuit, and upon searching the area where items were thrown found a wallet with personal items belonging to a Jason Thole. Response, 17. Respondent argues that the "jury reasonably inferred that the wallet thrown from the vehible was a wallet taken from the patrons of the Applebee's." Id.

In rejecting Petitioner's claim of insufficiency of the evidence in his direct appeal, the Oklahoma Court of Criminal Appeals stated:

> [Petitioner] claims the State's proof was insufficient because: (1) he presented alibi evidence in the form of testimony from his wife purportedly showing that he was not present at the time or place where the robberies were committed; (2) some witnesses saw only three robbers at the scene; and (3) he presented evidence that could have explained the presence of his DNA found on a robber's mask in the getaway car. These were all jury questions. It is the jury's job to weigh the evidence, resolve conflicting evidence, and reconcile conflicting testimony. We accept reasonable inferences and credibility choices which support the jury's verdict. Taking all the evidence presented in the case in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt that [Petitioner] robbed the restaurant and several of its customers as charged.

> [Petitioner] contends that the evidence on Count 2, robbery with a firearm, was insufficient to support conviction because there was no direct evidence that the victim named in that count had his wallet taken from him at gunpoint. Direct evidence is not required for a jury to find a defendant guilty

> beyond a reasonable doubt. In total we find there was sufficient circumstantial evidence from which jurors could reasonably infer that the victim named in Count 2 had his wallet taken from him at gunpoint either by [Petitioner] or by his associates with whom he was operating in concert.

Response, Ex. 3, 2-3 (citations omitted). In order to be entitled to habeas relief on Grounds One and Two, Petitioner must show that the Oklahoma Court of Criminal Appeals' decision was contrary to or an unreasonable application of Federal law, or that its decision was based on an unreasonable determination of the facts in light of the evidence presented at his trial.

Judicial review of Petitioner's habeas challenge to the sufficiency of the evidence presented at his trial "does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit." Herrera v. Collins, 506 U.S. 390, 402 (1993). For habeas review, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Both direct and circumstantial evidence is considered in determining whether evidence is sufficient to support a conviction. Lucero v. Kerby, 133 F.3d 1299, 1312 (10th Cir. 1998). In applying this standard, the reviewing court "may not weigh conflicting evidence nor consider the credibility of witnesses," but must "'accept the jury's resolution of the evidence as long as it is within the bounds of reason.'" Messer v. Roberts, 74 F.3d 1009, 1013 (10th Cir. 1996) (quoting Grubbs v. Hannigan, 982 F.2d 1483, 1487 (10th Cir. 1993)). "The inquiry is based upon the entire record and the reasoning process actually used by the trier of fact, known or not, is not

considered." Torres v. Mullin, 317 F.3d 1145, 1151 (10th Cir. 2003) (citation omitted).

The standard for sufficiency of the evidence "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n.16. In Oklahoma, a person commits robbery with a firearm when he (1) wrongfully; (2) takes; (3) the personal property (4) of another, (5) from another; (6) by force or fear; (7) through the use of a firearm. Cummings v. Evans, 161 F.3d 610, 614 n.1 (10th Cir. 1998) (citing Okla. Stat. tit. 21, §§ 791, 801).

Two victims of the robbery testified that four or more persons participated in the crime. Richard Hackler, who was seated facing the door of the restaurant, testified that four to six men entered and "instructed everyone to get onto the floor, this was a robbery, and it was not a joke." Trial Tr. Vol. I, p. 79, l. 10-14. He testified that two of the men went immediately to the back of the restaurant, and that two stayed in the front. Trial Tr. Vol. I, p. 80, l. 8-10; p. 82, l. 23-25; p. 83, l. 1-4. Mr. Hackler's 911 call was played at the trial, and he testified that the tape – in which he purportedly stated twice that there were four robbers – refreshed his memory as to the number of robbers. Trial Tr. Vol. I, p. 92, l. 2-14; p. 93, l. 18-23. Waiter Matthew Neal also testified that as he was getting ready to leave for the night "[f]our men came in the front door with guns and told everyone to get on the floor." Trial Tr. Vol. I, p. 141, l. 8-25; p. 142, l. 1-5. Detective Ryan Porter testified that in the course of his investigation he learned that the car belonged to Petitioner's fiancé, that Petitioner knew all three of the men who were apprehended the night of the robbery, and that all three had been at Petitioner's home for a party earlier that same day. Trial Tr. Vol. I, p. 163, l. 14-19;

p. 165, l. 5-22; p. 168, l. 1-25; p. 169, l. 1-10.  The technical investigator who examined the car after it had been secured as evidence found four sets of latex gloves, two guns, and four masks.  Trial Tr. Vol. II, p. 95, l. 20-25; p. 96, l. 1-7; p. 98, l. 20-23; p. 99, l. 2-11; p. 100, l. 14-25; p. 101, l. 1-21; p. 103, l. 14-18; p. 107, l. 1-11.  An officer at the scene of the crash following the chase found a sawed off multi-action shotgun laying on the ground outside the car to the rear and on the passenger side.  Trial Tr. Vol. II, p. 27, l. 8-15.  One of the officers who pursued the robbers as they fled on foot after the crash heard shots being fired as the suspects ran, and called out that one of the suspects had dropped a gun; the gun was later recovered at that location.  Trial Tr. Vol. II, p. 53, l. 6-17; p. 56, l. 5-12; p. 57, l. 2-8; p. 57, l. 17-24.  He also called out "shots fired, four of 'em eastbound."  Trial Tr. Vol. II, p. 53, l. 12-17.  Upon reviewing a dash cam videotape of the police pursuit, an officer saw what appeared to be a wallet thrown out of the eluding car.  Trial Tr. Vol. II, p. 40, l. 7-24.  A checkbook was later recovered at that exact location and taken into evidence.  Id.  The wallet/checkbook contained a social security card, driver's license, and other cards belonging to a Jason Thole. Trial Tr. Vol. II, p. 80, l. 2-25. A review of one dash cam also apparently revealed a fourth man, shirtless, running from the area of the crash.  Trial Tr. Vol. I, p. 191. 1. 24-25; p. 192, 1. 3-5.  Petitioner's wife, then-fiancé, was the only alibi witness who testified at the trial, and she testified that Petitioner was asleep on the couch, she woke him and told him to go to bed, which he did and she then came to bed around 10:00 to 10:15 p.m., awoke around 8:30 or 9:00 a.m. the following morning, and to her knowledge, he did not leave the whole night.  Trial Tr. Vol. III, p. 31, 1. 6-23; p. 34, l. 3-12.  She stated that she

used to make homemade masks for her husband to wear when treating their lawn for fleas and ticks, and that she kept a box of latex gloves in her car for him to use when cleaning the car, changing the oil, or treating the lawn with pesticides.  Id. at p. 35, l. 2-25; p. 36, l. 1-19. She also stated that she was pregnant with Petitioner's child at the time of the robbery, that they lived together, that he had access to her home and vehicle, and that their finances were commingled.  Trial Tr. Vol. III, p. 45, l. 21-25; p. 46, l. 11-24.  Finally, Petitioner's DNA was found on one of the masks and he could not be excluded as a donor of the DNA from one of the latex gloves found in the car after it had been secured as evidence.  Trial Tr. Vol. II, p. 154, 1. 1-5; p. 158, l. 20-25; p. 159-63.

Taking this evidence in the light most favorable to the prosecution, the undersigned finds that with the exception of Count 2, a rational jury could find that Petitioner committed the acts necessary to prove robbery with a firearm under Oklahoma law.  Accordingly, it is recommended that relief be denied on Ground One.

However, the undersigned will defer decision as to Ground Two pending receipt of supplemental briefing as to the sufficiency of the evidence regarding the charge of first degree robbery of Jason Thole.  It seems questionable whether evidence that (1) something was thrown from the car during pursuit and (2) a wallet containing items apparently belonging to a man named Jason Thole was found in the same location, logically supports an inference that the wallet was taken from the person or presence of Jason Thole by force or fear.  See  Trial Tr. Vol. II, p. 40, l. 7-24 and p. 80, l. 2-25.  As noted above, the evaluation of whether evidence is sufficient to support a conviction must be done with reference to the

substantive elements of the crime.  <u>Jackson</u>, 443 U.S. at  324 n.16.  In Oklahoma, robbery

requires that the property taken must be so in the possession or under the control of the

individual robbed, that violence or putting in fear was the means used whereby the robber

took the property.  <u>Fields v. State</u>,  364 P.2d 723, 726 (Okla. Crim. App.1961).  As stated by

the committee notes to the Oklahoma Uniform Jury Instructions:

> The crime of robbery is basically an aggravated form of larceny. <u>Inman v.
> State</u>, 61 Okl. Cr. 73, 65 P.2d 1228 (1937); <u>Berry v. State</u>, 44 Okl. Cr. 150,
> 279 P. 982 (1929); <u>Randall v. State</u>, 33 Okl. Cr. 262, 243 P. 983 (1926). The
> treatises list the elements of robbery as basically identical to the elements of
> larceny with the addition of two distinguishing elements: the taking must be
> from the *person or the immediate presence of the one robbed*; and the taking
> must be accomplished by use of force or fear. W. Clark & W. Marshall, A
> Treatise on the Law of Crime § 12.09, 882 (7th ed. 1967); W. LaFave & A.
> Scott, Criminal Law § 94, at 692 (1972); R. Perkins, Criminal Law 279 (2d ed.
> 1969).

Committee Notes, OUJI-Crim. 2nd Ed., No. 4-141 (OCCA Online,

http://www.okcca.net/online/oujis/oujisrvr.jsp?oc=OUJI-CR%204-141) (accessed Nov. 23,

2009) (emphasis added).

Here, there appears to be no direct or circumstantial evidence that Jason Thole was

even present at Applebee's.  Even if the discarding of the wallet from the car during the

police pursuit supports an inference that it was unlawfully acquired, it does not appear to

support an inference that it was taken "from the person or immediate presence" of Jason

Thole during the robbery at Applebee's.  Accordingly, both parties will be invited by

separate order to further address the sufficiency of the evidence issue regarding Ground Two.

**B. GROUND THREE - ERRONEOUS SENTENCING RANGE**

In his third ground for relief, Petitioner contends that the trial court used the incorrect enhancement statute in arriving at his decision to sentence Petitioner to thirty years imprisonment on each count. Petition, 9. Petitioner claims that the trial court should have used the specific enhancement provision contained in the robbery statute as opposed to the general felony enhancement statute. Id.; compare Okla. Stat. tit. 21, § 801 with Okla. Stat. tit. 21, § 51.1(B).

Respondent argues first that the claim raised in Ground Three is not proper for federal habeas review because Petitioner's sentences fell within the applicable range. Response, 19. He also claims that the State properly elected to enhance under the general after former statute as Petitioner had five previous felony convictions, of which two were other than for robbery offenses. Response, 20-21. Finally, he argues that the sentence falls within either of the ranges provided for by the applicable enhancement statutes. Id.

On direct review, the Oklahoma Court of Criminal Appeals held:

> [Petitioner] claims his sentence is excessive because it is based on an erroneous sentencing range. Each of the five thirty year sentences were within the range specified by 21 O.S. 2001, § 801, regardless of what statutory sentence enhancement provisions that might apply and regardless of what sentence enhancement statutes the district court judge might have considered. Therefore, given that the sentences imposed on each count are within the prescribed statutory range, and given further that under the specific facts and circumstances of this case (especially [Petitioner's] criminal history) the sentences seem appropriate, our collective conscience is not shocked by the five concurrent thirty year sentences imposed by the district court.

Response, Ex. 3, 3-4 (citations omitted).

A state sentence raises federal constitutional concerns when it is grossly disproportionate to the crime committed. Lockyer v. Andrade, 538 U.S. 63, 77 (2003); Hawkins v. Hargett, 200 F.3d 1279, 1281-82 (10th Cir. 1999) (applying Harmelin v. Michigan, 501 U.S. 957 (1991)).  In reviewing a sentence for gross disproportionality, a federal habeas court should be reluctant to "interfere with the legislative determination of an appropriate sentence range."  Hawkins, 200 F.3d at 1285.  If an initial comparison of the offense and the sentence does not lead to an inference that the punishment is grossly disproportionate to the crime, a federal habeas court's examination of the sentence ends.  See id. at 1282; see also United States v. Gurule, 461 F. 3d 1238, 1247 (10th Cir. 2006).  As stated recently by the Tenth Circuit Court of Appeals, the gross disproportionality principle has rarely resulted in relief from an allegedly excessive sentence:

> Although the Supreme Court has reviewed Eighth Amendment challenges to a number of state and federal sentences, it has struck down only two of them over the past century. In [1910] the Court invalidated under the Eighth Amendment a sentence of fifteen years in chains and at hard labor, plus permanent surveillance and civil disabilities, for the crime of falsifying a public document. Seventy-three years later, in [1983], the Court invalidated under the Eighth Amendment a sentence of life imprisonment without the possibility of parole imposed under South Dakota law against a nonviolent recidivist whose final crime was writing a "no account" check with the intent to defraud.

> In contrast to these two cases, the Supreme Court has rejected Eighth Amendment challenges to the following sentences:

>> • A life sentence, with the possibility of parole, under a Texas recidivist statute for successive convictions of (1) fraudulent use of a credit card to obtain $80 worth of goods or services, (2) passing a forged check in the amount of $28.36, and (3) obtaining $120.75 by false pretenses.

• A forty-year sentence for possession and distribution of 9 ounces of marijuana.

• A life sentence, without the possibility of parole, for possession of more than 650 grams of cocaine.

• A twenty-five year to life sentence imposed under a California recidivist statute for the offense of felony grand theft (i.e., stealing three golf clubs worth approximately $1,200).

• Two consecutive twenty-five-year to life sentences under a California recidivist statute for two counts of petty theft.

Considered together, these cases clearly support the Supreme Court's recent statement in <u>Andrade</u> that "[t]he gross disproportionality principle reserves a constitutional violation for only the extraordinary case.".

<u>United States v. Angelos</u>, 433 F.3d 738, 750-51 (10th Cir. 2006) (citations omitted); <u>Haney v. Addison</u>, No. 07-6269, 275 Fed. Appx. 802, 807 (10th Cir. Apr. 30, 2008),[3] <u>cert denied</u> 129 S. Ct. 766 (2008), <u>rehearing denied</u>, 129 S. Ct. 1408 (2009).

The undersigned finds that Petitioner's thirty-year sentence on each of the five counts does not warrant federal habeas relief. The sentences fall within the statutory range regardless of which enhancement provision is applied. <u>Compare</u> Okla. Stat. tit. 21, § 801 ("any person guilty of three separate and distinct felonies, in violation of this section shall suffer punishment by imprisonment for life in the State Penitentiary, or for a period of time of not less than ten (10) years, and it is mandatory upon the court to impose no less than the

_____

[3]This and any other unpublished disposition are cited pursuant to Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

minimum sentence of ten (10) years") <u>with</u> Okla. Stat. tit. 21, § 51.1(B) (conviction of

enumerated felony after commission of two or more previous felonies within ten years carries

a sentence range of twenty (20) years to life).  <u>See</u>, <u>Turner v. State</u>, 803 P. 2d 1152, 1158

(Okla. Crim. App. 1990) (Proper for state to seek enhancement under either § 801 or § 51,

when defendant had two prior robbery with firearms convictions and three non-robbery

felony convictions).[4]  Furthermore, it is not grossly disproportionate to the offense of robbery

with a firearm which evidence shows took place in a restaurant full of patrons, including

discharge of a firearm during the robbery, and a subsequent high-speed chase culminating

in shots being fired at pursuing officers. Therefore, Petitioner's claim does not present a

federal constitutional issue.  <u>Archer v. Ray</u>, No. 06-6083, 188 Fed. Appx. 799, 801 (10th Cir.

July 17, 2006). It is recommended that relief be denied as to Ground Three.

### C.  GROUND FOUR – CONSIDERATION OF 85% RULE

In his fourth ground for relief, Petitioner alleges that in arriving at the sentence

imposed the trial court failed to take into consideration the statutory 85% limit on parole

eligibility.  Petition, 11.

Respondent contends that this claim is not cognizable in a federal habeas action.

Response, 21.  Furthermore, he argues that Petitioner waived jury sentencing and that there

is no evidence that the trial court failed to consider the fact that Petitioner would be required

---

[4]Petitioner stipulated to his prior felony convictions at sentencing, Response, Ex. 4, p. 33-34 of Sentencing Transcript, and the record shows he had prior convictions for both robbery and non-robbery offenses.  Response, Ex. 8, p. 38.

16

to serve 85% of his sentence before being eligible for parole. Response, 21-22. He also argues that unless there is some contrary indication in the record, a trial judge is presumed to know and apply the law in his or her rulings. Response, 22. Finally, he claims that the Tenth Circuit Court of Appeals has held that the 85% Rule is based on Oklahoma law and a state ruling contrary to the rule is thus not an unreasonable application of controlling Supreme Court precedent. Id. at 22.

On direct appeal, the Oklahoma Court of Criminal Appeals stated:

> [Petitioner] claims his sentence is excessive because "**the record does not reflect** the sentencing court considered all consequences of the sentences, including mandatory service under the '85% Rule.'" In Anderson v. State, we held that sentencing juries must be instructed on the 85% rule where it applies. [Petitioner] opted, however, to be sentenced by the district court judge rather than by jury. Unlike a juror, a judge is presumed to know the procedures involved in sentencing. Logically, then, it is the defendant's burden to rebut the presumption by showing that the judge did not know the applicable sentencing law and did not factor it into his decision.
>
> [Petitioner] points to nothing in the record suggesting that the judge was not aware of the statutory 85% limit on parole eligibility that would apply to him and points to nothing in the suggesting [sic] that the judge did not factor the 85% limit into his sentencing decision. [Petitioner] complains only that there is no record that the district court judge considered the 85% statutory limit on parole. By merely complaining that there is no record that the judge considered the 85% limit on parole, [Petitioner] falls far short of actually rebutting the presumption that the trial court judge acted with full knowledge of the applicable sentencing law and that he correctly applied that law to him. This claim is denied.

Response, Ex. 3, 4-5 (citations omitted).

Under Oklahoma law, a person who has committed certain enumerated statutory offenses must serve 85% percent of his sentence before being eligible for parole

consideration (the 85% Rule). Okla. Stat. tit. 21, §§ 12.1 and 13.1. Section 12.1 states: "A person committing a felony offense listed in [ Section 13.1] on or after March 1, 2000, and convicted of the offense shall serve not less than eighty-five percent (85%) of the sentence of imprisonment imposed within the Department of Corrections." Okla. Stat. tit. 21, § 12.1. The crime of robbery with a firearm is one of the listed offenses, making the 85% Rule applicable to Petitioner's convictions. Id. In Anderson v. State, 130 P.3d 273 (Okla. Crim. App. 2006), the Oklahoma Court of Criminal Appeals held that juries must be instructed on the "85% Rule."

However, as correctly noted by Respondent, Petitioner waived jury determination of his sentence. Thus, although the 85% Rule is applicable to Petitioner's sentence, Anderson is technically not as there was no jury to instruct. Moreover, the trial court's failure to state in the sentencing proceeding or elsewhere that the impact of the 85% Rule on Petitioner's sentence had been considered does not support Petitioner's claim. As stated by the United States Supreme Court:

> We do not think that a federal court can presume so lightly that a state court failed to apply its own law. As we have said before, § 2254(d) dictates a " 'highly deferential standard for evaluating state-court rulings,' which demands that state-court decisions be given the benefit of the doubt." To the extent that the [Sixth Circuit] Court of Appeals rested its decision on the state court's failure to cite [the applicable precedent], it was mistaken. Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation.

Bell v. Cone 543 U.S. 447, 455 (2005). Thus, even if the failure to consider the 85% Rule were an error of constitutional dimension, this Court should not presume that such an error

occurred simply because the record was silent on the issue.  Moreover, the Tenth Circuit Court of Appeals has held that

> the 85% Rule is based on law specific for Oklahoma. Habeas relief under the Antiterrorism and Effective Death Penalty Act allows relief only where the state ruling was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1). Petitioner has not shown an unreasonable application of controlling Supreme Court precedent.

Foote v. Province, No. 08-6250, 316 Fed.Appx. 790, 793 (10th Cir. Mar. 18, 2009).  It is therefore recommended that relief be denied on Ground Four.

### D.  GROUND FIVE - EXCESSIVE SENTENCE COMPARED TO THAT OF CO-DEFENDANTS

In his fifth ground for relief, Petitioner claims that the sentence he received is excessive when compared to those received by his co-defendants.  Petition, 15. At his sentencing, the prosecutor noted that one defendant received a sentence of five years imprisonment, and that the other two received "approximately the minium." Sentencing Tr., 13 (Aug. 25, 2006).  Petitioner claims that the Oklahoma Court of Criminal Appeals erred in refusing to modify his sentence on this ground, violating his right to due process and equal protection.

Respondent counters that Petitioner's claim is not cognizable in this federal habeas proceeding as it is a matter of state law.  Response, 24.  He claims that Petitioner's sentence is neither outside statutory limits nor unauthorized by law, and that disparate sentences do not violate the constitution.  Response, 24-25.

On direct appeal, the Oklahoma Court of Criminal Appeals held that "a sentence

within the statutory range will be affirmed on appeal unless, considering all the circumstances, it shocks the conscience of this Court. We find nothing about this sentence as applied to this defendant that is shocking to our conscience." Response, Ex. 3, 6.

As noted above in connection with Ground Three, a state sentence raises federal constitutional concerns only when it is grossly disproportionate to the crime committed. Lockyer, 538 U.S. at 77, and a federal habeas court should be reluctant to "interfere with the legislative determination of an appropriate sentence range." Hawkins, 200 F.3d at 1285. The undersigned has previously found that Petitioner's sentence is within the appropriate range and not disproportionate to the crimes committed.

Petitioner's equal protection claim is also without merit. The "Equal Protection Clause requires the government to treat similarly situated people alike," Barney v. Pulsipher, 143 F.3d 1299, 1312 (10th Cir.1998), and Petitioner has failed to show the threshold requirement for such a claim: that he is similarly situated to anyone else who was sentenced to imprisonment for the robbery in question. See Harris v. Saffle, No. 01-6074, 25 Fed. Appx. 756, 758 (10th Cir. Nov. 23, 2001) (habeas petitioner "had failed to show that he and his co-defendant were similarly situated and therefore could not meet the threshold requirement for an equal protection challenge") (citations omitted)). From the sentencing proceeding it appears that the other defendants pled guilty, accepted responsibility and apologized for their actions, and had different criminal histories. Sentencing Tr., 13-14. Indeed, the Tenth Circuit Court of Appeals has held that the equal protection clause is not implicated when a court reaches different outcomes in cases with different facts. Jackson v.

Hines, No. 07-5133, 268 Fed. Appx. 773, 777 (10th Cir. Mar. 10, 2008), cert. denied 129

S.Ct. 1672 (2009).  As the Tenth Circuit held in Jackson:

> [Defendant] suggests that the disparate treatment of his claim by the [Oklahoma Court of Criminal Appeals]-affirming his sentence while reversing the sentences of two other defendants who received consecutive sentences from the same trial judge pursuant to her policy-violated his equal protection rights. However, his "argument here comes down to a contention that [Oklahoma] law was misapplied." See Beck v. Washington, 369 U.S. 541, 554 (1962). Despite their apparent similarity, the [Oklahoma Court of Criminal Appeals] found the sentences imposed on two other defendants an abuse of discretion under state law, and not his. This is not a violation of equal protection. The Fourteenth Amendment does not preclude a court from reaching different outcomes in cases with different facts, and even if the court erred, the Amendment does not protect against mere misapplication of state law. Id. at 554-55.

Jackson, 268 Fed. Appx. at 777 (parallel citations omitted).  Similarly, in Cummings v.

Sirmons, 506 F.3d 1211 (10th Cir. 2007), cert. denied, 128 S. Ct. 2943 (2008), the Court

held:

> Cummings attempts, nevertheless, to convert the issue into one involving federal constitutional law by arguing that the [Oklahoma Court of Criminal Appeals'] allegedly erroneous rejection of his argument on direct appeal resulted in (a) a violation of his equal protection rights because he was treated differently than other, similarly-situated Oklahoma criminal defendants, and (b) a violation of his due process right to a fair trial. We reject both arguments. To begin with, Cummings has cited to no United States Supreme Court decisions, and our own independent research has failed to produce any, holding that a state court's erroneous application of state criminal law can result in a violation of a criminal defendant's equal protection rights. Indeed, it would be surprising if such a rule existed, because it would essentially allow state criminal defendants to convert all state law issues raised on direct appeal into constitutional claims cognizable in federal habeas proceedings. In other words, it would require federal habeas courts to review the merits of all state law determinations that were resolved against a state criminal defendant on direct appeal.

Id. at 1237. Thus, Petitioner's contention that the Oklahoma Court of Criminal Appeals erred in failing to modify his sentence raises only an issue of state law, and not a claim under the equal protection clause. It is recommended that relief be denied on Ground Five.

### E.  GROUND SIX - PROSECUTORIAL MISCONDUCT

Sixth, Petitioner alleges that the prosecutor violated his rights by attempting to define "reasonable doubt" during voir dire, putting undue emphasis on a videotape by suggesting that it shows a fourth man running away from the wrecked getaway car, injecting his personal opinion, misstating the facts and the law, inviting the jury to conduct improper experiments, and appealing to the jury's sympathy by asking jurors to place themselves in the shoes of the victims. Petition, 17.

In rejecting these claims on direct appeal, the Oklahoma Court of Criminal Appeals stated:

> [Petitioner] claims he was denied a fair trial through prosecutorial misconduct. The only portion of this claim that was raised below occurred during voir dire when [Petitioner] complained about the prosecutor's attempts to define the term "reasonable doubt" and explain the State's burden of proof. According to [Petitioner], the prosecutor's voir dire colloquy with jurors on these points misled jurors by shifting the burden of proof to him. We find no error. The prosecutor's voir dire comments were similar to those approved by this Court in [an earlier case] where we found that "it was not error for prosecutors to state that reasonable doubt does not mean beyond any doubt or beyond a shadow of a doubt [and that] when read in context such comments were merely attempts by the prosecution to dispel commonly held attitudes rather than attempts to [re-]define reasonable doubt." None of [Petitioner's] other complaints of prosecutorial misconduct were raised at trial and after reviewing each of the allegedly offending comments we find that none of these claims rise to the level of reversible plain error.

Response, Ex. 3, 6 (citations omitted).

"Habeas relief is available for prosecutorial misconduct only when the misconduct is so egregious that it renders the entire trial fundamentally unfair." <u>Cummings v. Evans</u>, 161 F.3d 610, 618 (10th Cir. 1998)(citing <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 642-648 (1974)). However, where "prosecutorial misconduct directly affects a specific constitutional right such as the presumption of innocence or privilege against self-incrimination, a habeas petitioner need not establish that the entire trial was rendered unfair, but rather that the constitutional guarantee was so prejudiced that it effectively amounted to a denial of that right." <u>Torres v. Mullin</u>, 317 F.3d 1145, 1158 (10th Cir. 2003) This determination is made "only after considering all of the surrounding circumstances, including the strength of the state's case." <u>Malicoat v. Mullin</u>, 426 F.3d 1241, 1255 (10th Cir. 2005).

**1. Presumption of Innocence**

Petitioner claims that some of the prosecutor's comments attempted to negate the presumption of innocence. In particular, he claims that the prosecutor's comments during voir dire – in which he attempted to define the applicable burden of proof – negated the presumption of innocence and distorted the reasonable doubt standard of proof. Petition, 17. In his brief on direct appeal, Petitioner also complained about comments made during closing argument regarding the defense's failure to provide corroborating evidence of one of the 911 calls and his fiancé's alibi testimony. Response, Ex. 1, 33-34. Although Petitioner does not raise these last two points in this action, Respondent did address them and so the undersigned will as well. <u>See</u> Response, 31.

Petitioner's first claim regarding the prosecutor's discussion of the burden of proof

concerns the following exchange during voir dire, which came after a prospective juror asked

"[w]hat do you mean by burden?":

> [PROSECUTOR]: Well, and we can talk about that, too. In the State of Oklahoma and in this country in criminal cases the burden is proof beyond a reasonable doubt, and you've heard that before?
>
> [PROSPECTIVE JUROR]: Yes.
>
> [PROSECUTOR]: And Judge Savage told you that the lawyers in this case and the Court, we're not going to be able to tell you what beyond a reasonable doubt means. We can tell you what it does not mean. And it does not mean certain things like you might have heard, like beyond a shadow of a doubt, or, you know, beyond all doubt, is that fair to say?
>
> [PROSPECTIVE JUROR]: Yes.
>
> [PROSECUTOR]: And so can you distinguish between the notions of proof beyond a reasonable doubt and proof beyond a shadow of a doubt?
>
> [PROSPECTIVE JUROR]: Yes.
>
> [PROSECUTOR]: Is there anyone here on this panel who thinks that beyond a reasonable doubt equals beyond a shadow of a doubt?
>
> ...
>
> [PROSECUTOR]: But it's still fair to say, and disagree with me, raise your hand if you disagree, that even if we don't all have 100 percent certainty that [Petitioner] committed this crime that we can still find, the jury can find him guilty by proof beyond a reasonable doubt.

Tr. of Voir Dire Proceedings, p. 77, l. 5-25; p. 78, l. 1; p. 79, l. 4-9.

In Gordon v. Ward, the Western District of Oklahoma and the Tenth Circuit Court of Appeals addressed similar circumstances and concluded that the challenged comments did not render the trial fundamentally unfair. Gordon v. Ward, Case No. CIV-03-1342-M, slip

op. at 6-9 (W.D. Okla. May 20, 2004) (Couch, M.J.), <u>adopted</u>, Order (W.D. Okla. June 14, 2004) (Miles-LaGrange, J.), <u>appeal dismissed</u>, 118 Fed. Appx. 434, 436 (10th Cir. Dec. 9, 2004). There the petitioner objected to the following comments made by the prosecutor during voir dire:

> In terms of beyond a reasonable doubt, in Oklahoma the judge, the lawyers, nobody can define what beyond a reasonable doubt means. You have to decide that for yourself. Okay? I'll tell you what it doesn't mean. It doesn't mean - you may have heard on TV terms like beyond a shadow of a doubt or or beyond all doubt. Do you see that there's a difference between beyond a reasonable doubt and those phrases I've just talked about?
>
> . . . . Do you understand that there's a difference between beyond a reasonable doubt and say beyond a reasonable doubt and beyond a shadow of a doubt and beyond all doubt, is there a difference to you between those particular phrases?

<u>Id.</u>, slip op. at 7 (citation omitted). The Oklahoma Court of Criminal Appeals concluded that the statements did not constitute error. <u>See id.</u> at p. 8. In her Report and Recommendation, United States Magistrate Judge Valerie Couch stated:

> The prosecutor's statements, whether right or wrong, did not infect the trial with unfairness nor could the statements plausibly have tipped the scales in favor of the prosecution or rendered Petitioner's trial fundamentally unfair. The [Oklahoma Court of Criminal Appeals'] standard for reviewing the prosecutorial misconduct claim was not contrary to Supreme Court law, nor was its application objectively unreasonable in this case. Petitioner is not entitled to relief on this ground.

<u>Id.</u>, slip op. at 9. United States District Judge Vicki Miles-LaGrange adopted the recommendation and the Tenth Circuit Court of Appeals dismissed the appeal, holding that the Oklahoma Court of Criminal Appeals' disposition was not contrary to or an unreasonable application of clearly established federal law. <u>Gordon v. Ward</u>, 118 Fed. Appx. 434, 436

25

(10th Cir. Dec. 9, 2004). Accordingly, the undersigned finds that Petitioner is not entitled to relief on the basis of these remarks.

On direct appeal, Petitioner also claimed that the prosecutor attempted to shift the burden of proof during his closing argument. Response, Ex. 1, 33. First, referring to defense counsel's statement in her argument that she could not find one of the individuals whose 911 call was played for the jury, the prosecutor stated: "Well, is there any evidence presented to that? Is there any evidence presented to that point that she couldn't find him or is it possible to bring him here to testify?" Trial Tr. Vol. III, p. 88, l. 10-15. There was no objection to this remark, however, the following comment did draw an objection from defense counsel: "Counsel talks about, then about Mrs. Walton, about the cookout, about how her husband was drunk. Does counsel ever present any independent evidence to corroborate the statements - -." Trial Tr. Vol. III, p. 92, l. 13-17. At the bench conference that followed, the trial judge told the prosecutor that he did not "want you to argue anything that implies to the jury that the burden is shifted from the State." Id. at p. 93, l. 3-5. Immediately thereafter, the prosecutor told the jury: "The State bears the burden of presenting evidence and ultimately defense counsel and the Defendant don't have to do anything. They don't have to present any evidence. But you still get to consider the evidence presented in this case, you still get to evaluate that evidence that's presented." Id. at p. 93, l. 17-23.

As noted, "[w]here prosecutorial misconduct directly affects a specific constitutional right such as the presumption of innocence or privilege against self-incrimination, a habeas petitioner need not establish that the entire trial was rendered unfair, but rather that the

constitutional guarantee was so prejudiced that it effectively amounted to a denial of that right." Torres v. Mullin, 317 F.3d 1145, 1158 (10th Cir. 2003); Hamilton v. Mullin, 436 F. 3d 1181, 1187 (10th Cir. 2006). This determination is made "only after considering all of the surrounding circumstances, including the strength of the state's case." Malicoat v. Mullin, 426 F.3d 1241, 1255 (10th Cir. 2005).

Here, after the trial court instructed the prosecutor to refrain from any comments that might impliedly shift the burden of proof, the prosecutor immediately and unequivocally reiterated the applicable burden: "defense counsel and the Defendant don't have to do anything ... they don't have to present any evidence." Trial Tr. Vol. III, p 93, l. 19-20. In light of the proceedings as a whole, the undersigned finds that the remarks were not of such a character that the jury would naturally and necessarily shift the burden of proof to Petitioner. See Delgado v. Barreras, No. 97-2007, 1997 WL 785525 at *2 (10th Cir. Dec. 22, 1997) (no prosecutorial misconduct where prosecutor's remarks were not a direct statement on the presumption of innocence and remarks were in response to defense counsel's comments during closing argument). To the extent the comments standing alone might tend to impliedly shift the burden of proof, the admonition given immediately thereafter by the prosecutor himself sufficiently clarified the matter. In light of this standard, the undersigned finds that the prosecutor's comments do not entitle Petitioner to relief.

## 2. Prosecutor Injected Own Opinion Regarding Contents of Videotape

Next, Petitioner complains that the prosecutor put an undue emphasis on a video taken from one of the patrol car dash cams. Petition, 17. In the first part of his closing argument,

the prosecutor stated:

> I want to cover one other issue very quickly and that is the issue, before we move one, and that is the issue of the videotape. I'm telling you very sincerely that the videotape in this case must be examined very clearly with a very careful eye so you can truly know what's going on in this case. I'm going to tell you right now that you may have to watch it 20 or 30 times so that you can pick up on what exactly is going on.

> I watched it myself many, many, many times and I'm urging you to do the same. I want to give you a little guidance, and I submit to you, and I'm going to play the video in a second for you to see one more time. When you take it back to the jury room you can play it as many times as you would like. I'm going to submit to you that in the video, which you've seen once, when the car initially crashes very briefly thereafter you will see a man in a red shirt, a man in a black shirt, a man in a white shirt, and a man in no shirt.

> The man in the red is in the very front of this pack. It's very hard to see because there appears to be a red door or wall right when he's turning that initial corner. But you've got to look for the man in the red shirt in the front. I'm also going to urge you, to convince you that there is a person with no shirt that when Officer, when Sergeant Reece's camera views the men for the second time you will only see three men as you watch, but you will see a man in a red shirt, a man in a black shirt, a man in a white shirt and no fourth man.

Trial Tr. Vol. III, p. 59, l. 20-25; p. 60, l. 1-25. In the second part of his closing, the

prosecutor again referred to the videotape:

> Now, the videotape in this case we're having some technical problems, but we're going to have to adjust it. That's probably a good thing, because it doesn't matter what I tell you about the video. That's meaningless, it's what you see yourself and you're going to get a chance to consider this. You've already seen it once. It doesn't matter at all, I mean, if I bring this over and point to here and point to there, it doesn't matter. It's yours to look at. All that matters is how you feel about the videotape.

Trial Tr. Vol. III, p. 87, l. 24-25; p. 88, l. 1-9.

The undersigned finds that these comments were not improper. First, the very

purpose behind a closing argument is "to explain to the jury what it has to decide and what evidence is relevant to its decision." Sandoval v. Calderon, 241 F.3d 765, 776 (9th Cir.2000); Gautt v. Lewis 489 F.3d 993, 1013 (9th Cir. 2007) ("The government's closing argument is that moment in the trial when a prosecutor is compelled to reveal her own understanding of the case as part of her effort to guide the jury's comprehension."), cert. denied 128 S. Ct. 1477 (2008). "A prosecutor is allowed to comment on the evidence and draw inferences therefrom . . ." Thornburg v. Mullin, 422 F.3d 1113, 1134 (10th Cir. 2005). Of course, a prosecutor may not inject his personal opinion regarding guilt. Cargle v. Mullin, 317 F.3d 1196, 1218 (10th Cir. 2003).

Although there appears to be nothing improper about the prosecutor's argument regarding the videotape, the undersigned alternatively finds that the comments did not so infect the trial as to render the resulting conviction a violation of due process. Petitioner has not shown that the Oklahoma Court of Criminal Appeals' rejection of his claim of prosecutorial misconduct based on these comments was contrary to or an unreasonable application of the prevailing Donnelly standard. Donnelly v. DeChristoforo, 416 U.S. 637, 642-48 (1974) (habeas relief is available for prosecutorial misconduct only when the misconduct is so egregious that it renders the entire trial fundamentally unfair).

### 3. Misstatement of the Law and Facts

Petitioner next contends that the prosecutor misstated two facts, and told the jury that they could not draw reasonable inferences from the testimony. Petition, 17; Response, Ex. 1, 38. He claims that the prosecutor incorrectly stated during closing argument that

Petitioner's wife "was awake for at least two hours before she called police to report that her 1999 Nissan Altima was stolen." Trial Tr. Vol. III, p. 66, l. 9-11. He also claims that the prosecutor told jurors that the forensic serologist testified that Petitioner's DNA was on one of the gloves found in the car. Trial Tr. Vol. III, p. 70, l. 15-23. Finally, he claims that the prosecutor misstated the law by telling the jury that "you do not get to make up what happened that night. You do not get to fill in the gaps that [Petitioner's wife] left open. You don't get to assume that she saw him at some point that night. Her testimony is her testimony." Trial Tr. Vol. III, p. 66, l. 13-17.

Respondent counters that the testimony of Petitioner's wife was that she awoke between 6:30 a.m. and 7:00 a.m., and did not notice that her car was missing until "8:00, 8:00ish or 7o'clock'ish." Response, 35. Thus, Respondent contends that this testimony – that Petitioner's wife was awake from 6:30 a.m. to 8:00ish – is consistent with a two hour gap. Id. Alternatively, he argues that any misstatement was a minor one. Id. The undersigned agrees. No relief is warranted for a prosecutor's argument regarding facts not in evidence or misstatement of facts unless it was sufficiently prejudicial to render the trial unfair. Donnelly, 416 U.S. at 642-48. Moreover, the prosecutor's statements were reasonable based on the testimony.

The same is true of the prosecutor's comments regarding the testimony of the forensic serologist. Although the prosecutor mischaracterized the testimony as Petitioner's "DNA is on the glove," rather than the actual testimony that he could not be excluded as a contributor to the DNA found thereon, he also added that "we will have more time to talk about these

as we look at the charts. But I want you to know that this is your case to evaluate. You get to read the reports. You don't have to listen to me. You get to listen to the evidence." Trial Tr. Vol. III, p. 70, l. 20-25. Then, in the second part of his closing argument, the prosecutor twice correctly stated that Petitioner's "DNA cannot be excluded from the latex glove...." Trial Tr. Vol. III, p. 97, l. 10-11; Vol. III, p. 91, 1. 21-22. Because the prosecutor urged the jury to consider the evidence itself rather than his characterization of it, and then accurately described the testimony in the second part of the argument, any misstatement was not so prejudicial as to render Petitioner's trial unfair.

Finally, it is questionable whether the prosecutor's statement that the jury does "not get to fill in the gaps that [Petitioner's wife] left open" can be construed as telling the jury that it is not entitled to draw reasonable inferences from the evidence; in any event, the statement is not sufficiently prejudicial to warrant relief. The jury was specifically instructed that it was "permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified." Response, Ex. 15 (Instruction No. 10). In his closing argument, the prosecutor also told the jury that it was going to get a copy of the instructions, "and you can read over those instructions so that nothing is confusing, nothing is left out." Trial Tr. Vol. III, p. 71, l. 12-15.

 "Absent evidence to the contrary, we presume that jurors remain true to their oath and conscientiously observe the instructions and admonitions of the court." Lucero v. Kerby, 133 F.3d 1299, 1309 (10th Cir. 1998); see Le v. Mullin, 311 F.3d 1002, 1013 (10th Cir. 2002) (inquiry into fundamental fairness includes examination of any cautionary steps - such as

instructions to the jury - offered by the court).  Any confusion caused by the wording of the prosecutor's comment was adequately ameliorated by the instruction given by the trial court.  Accordingly, relief on this ground is not warranted.

### 4.  Invitation to Conduct Experiments

Petitioner also complains that the prosecutor improperly invited the jury to conduct an experiment during deliberations.  Petition, 17.  In particular, he refers to the prosecutor's suggestion that the jury "pull up the chairs and form a seating arrangement in a vehicle ... and to "[i]magine a person sitting in [the rear passenger side] crouching over stuffing masks into a 3x5 index card holder.... It would be awfully difficult to see that third person crouching down hiding evidence from police."  Trial Tr. Vol. III, p. 90, l. 23-25; p. 91, l. 1-3, 10-15.

Respondent counters that there is no constitutional command preventing a jury from using common sense and ordinary props to reenact a crime during deliberations. Response, 38.  The undersigned agrees.

The prosecutor was responding to defense counsel's argument that the officer who originally stopped the getaway vehicle was only able to see three occupants in the car.  Trial Tr. Vol. III, p. 78, l. 24-25; p. 79, l. 1-8.  Asking the jury to pull up chairs into the commonly known arrangement of seats in a car, and to then consider whether a person bending down to hide items in the back passenger floorboard could be seen, was not improper. See Trial Tr. Vol. II, p. 102, l. 3-7. "There is simply no constitutional command preventing a jury from using common sense and ordinary and uninflammatory props to reenact a crime in the privacy of the jury room." United States. v. Abeyta, 27 F.3d 470, 477 (10th Cir. 1994) (citing

32

United States v. Hephner, 410 F.2d 930, 936 (7th Cir.1969) ("Jurors must be given enough latitude in their deliberations to permit them to use common experiences and illustrations in reaching their verdict.")). Accordingly, relief should be denied on this part of Petitioner's claim of prosecutorial misconduct.

### 5. Appeal to Juror Sympathy

As his final argument in support of his claim of prosecutorial misconduct, Petitioner contends that the prosecutor improperly asked jurors to put themselves in the shoes of the victims. Petition, 17; Response, Ex. 1, 40. During his closing argument, the prosecutor was addressing defense counsel's argument regarding inconsistencies in the victims' testimony regarding the number of robbers. He asked the jurors to imagine if they were asked to "step outside for one second, count the number of people and then drop to the ground, it would be pretty difficult." Trial Tr. Vol. III, p. 88, l. 24-25; p. 89, l. 1-4. He then added:

> Now imagine those people have guns, and imagine I didn't ask you to do it, but they told you to get on the ground and pulled their guns out, these people are under incredible, an incredibly stressful situation. You heard it in the tenor of their voice when they testified. You heard it on the 911 tapes. Imagine the fact that they were not there to count the number of people. They were victims of a crime.

Trial Tr. Vol. III, p. 89, l. 5-12.

Thus, in arguing that the comment was designed to evoke sympathy, Petitioner completely ignores its context. Asking the jury to consider the effect of a stressful situation on a witness' power of perception is not the same as asking the jury to sympathize. Moreover, although the "jury should make decisions based on the strength of the evidence,

and not on raw emotion ... we recognize that some emotional influence is inevitable." Wilson v. Sirmons, 536 F.3d 1064, 1120 (10th Cir. 2008). Thus, the undersigned finds no merit in Petitioner's claim regarding this remark.

In light of the foregoing, the undersigned finds that the Oklahoma Court of Criminal Appeals' decision rejecting Petitioner's claim of prosecutorial misconduct neither resulted in a decision that was contrary to or involved an unreasonable application of clearly established Federal law as determined by the Supreme Court, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1)-( 2). It is therefore recommended that relief be denied on Ground Six.

## F.  CUMULATIVE ERROR

Finally, in Ground Seven, Petitioner alleges that the cumulative effect of the alleged errors deprived him of a fundamentally fair trial. Petition, 19.  Respondent argues that cumulative error analysis only applies to constitutional errors, and that Petitioner has failed to show any error at all, much less errors of a constitutional magnitude.  Response, p. 42.  He claims that the Oklahoma Court of Criminal Appeals found no errors, harmless or otherwise, in its review on direct appeal.  Id.  Indeed, the Court stated: "Because we have examined each of [Petitioner's] allegations in detail and found no error, relief is not warranted on a cumulative error argument."  Response, Ex. 3, 7.

"Cumulative error analysis is an extension of harmless error and conducts the same inquiry as for individual error, focusing on the underlying fairness of the trial."  Darks v.

Mullin, 327 F.3d 1001, 1018 (10th Cir. 2003) (citations and internal quotations omitted). The cumulative effect of individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error. Duckett v. Mullin, 306 F.3d 982, 992 (10th Cir. 2002). Here, the undersigned finds that Petitioner has failed to establish any harmless error; therefore, there is no basis upon which to find cumulative error. See, e.g., Gonzales v. Tafoya, 515 F.3d 1097, 1126 (10th Cir. 2008) (denying petitioner's claim that he was prejudiced by the cumulative effect of his counsel's errors where court concluded counsel's performance was not constitutionally deficient and, therefore, there was no error to cumulate), cert. denied 129 S. Ct. 211 (2008); United States v. Caballero, 277 F.3d 1235, 1250 (10th Cir.2002 ) ("Cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors.") Therefore, Petitioner's claim of cumulative error is meritless, and it is recommended that relief be denied on Ground Seven.

## RECOMMENDATION

Based on the foregoing findings, it is recommended that the petition for a writ of habeas corpus be denied as to Grounds One, Three, Four, Five, Six and Seven. It is recommended that consideration of Ground Two be deferred pending receipt of supplemental briefs. If this Report and Recommendation is adopted, the undersigned will by separate order request supplemental briefs regarding Ground Two. Petitioner is advised of his right to file an objection to this Report and Recommendation with the Clerk of this Court on or before December 15, 2009, in accordance with 28 U.S.C. § 636 and Local Civil Rule 72.1.

Petitioner is further advised that failure to file a timely objection to this Report and Recommendation waives his right to appellate review of both factual and legal issues contained herein.  Moore v. United States, 950 F.2d 656 (10th Cir. 1991).  This Report and Recommendation does not dispose of all the issues referred to the undersigned Magistrate Judge in the captioned matter.

**ENTERED this 25th day of November, 2009**.


DOYLE W. ARGO
UNITED STATES MAGISTRATE JUDGE